***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at the time of the alleged accident.
3. The carrier on the risk at the time of the injury was St. Paul Travelers.
4. On August 6, 2002, plaintiff suffered an injury by accident to his low back.
5. Defendants accepted plaintiff's claim as compensable in a Form 60 filed on February 3, 2005.
6. As of the date of injury, plaintiff's average weekly wage was $484.99, which yields a compensation rate of $323.33 per week.
7. In addition, the parties stipulated into evidence the following at the hearing before the Deputy Commissioner:
 a. Packet of medical records and reports.
 b. Packet of rehabilitation reports.
 c. Packet of Industrial Commission forms and filings.
 d. Packet containing prior medical reports.
 e. Additional medical reports submitted August 24, 2006 from the Department of Psychiatry at Wake Forest University Medical Center.
8. The Pre-Trial Agreement dated June 5, 2006, which was submitted by the parties, is incorporated by reference. *Page 3 
9. This issues before the Full Commission are whether plaintiff is entitled to receive ongoing disability compensation after November 9, 2004; whether plaintiff's condition since November 9, 2004 resulted from his injury by accident; and whether plaintiff's depression and psychological problems were the proximate result of the injury by accident on August 6, 2002.
 *********** RULINGS ON EVIDENTIARY MATTERS
At the hearing before the Full Commission, plaintiff made a motion to admit additional medical records and defendants objected to the admission of the documents. In its discretion, the Commission hereby GRANTS plaintiff's motion and admits the additional medical records.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the hearing before the Deputy Commissioner, plaintiff was 52 years old. He has a GED. After serving in the Marines for six years, he worked for his father's car repair business for a couple of years and then worked as a heavy equipment operator, truck driver and crane operator for various employers. Plaintiff testified that he began working for defendant-employer in 1982 or 1983, however, the Form 19 indicates that plaintiff's employment started in late 1987. During his employment with defendant-employer, plaintiff operated cranes, performed rough carpentry work and worked as a driver.
2. On August 6, 2002, plaintiff sustained an admittedly compensable injury by accident when his feet became tangled in rebar and he fell onto the rebar, injuring his back and scraping his left leg. The following day, plaintiff was treated by Dr. John K. Collins at *Page 4 
Concentra Medical Center for complaints of mild back pain. Dr. Collins diagnosed plaintiff with a lumbar sprain and contusion, prescribed anti-inflammatory medication and physical therapy, and gave plaintiff some work restrictions. Plaintiff returned to Dr. Collins on August 7, 2002, reporting that he was feeling better. On August 14, 2002, plaintiff advised Dr. Collins that his pain had resolved and that he was back to regular work. Plaintiff's neurological examination was normal on each occasion, so Dr. Collins released him from medical care that day.
3. On October 10, 2002, plaintiff returned to Dr. Collins with complaints of some back pain worsening during the previous two weeks. Dr. Collins found that plaintiff had back pain with no radicular symptoms in his legs and he prescribed another course of medication and physical therapy. Despite the treatment, plaintiff continued to report persistent symptoms and Dr. Collins ordered an MRI. On November 8, 2002, plaintiff advised Dr. Collins that the pain seemed to shoot into his right leg. Dr. Collins put plaintiff on a 50 pound lifting restriction and recommended that plaintiff be evaluated by an orthopedic surgeon.
4. On November 25, 2002, Dr. Mitch Harris examined plaintiff and reviewed the MRI, which he considered to be of poor quality but which appeared to show some desiccation of the L5-S1 disc and some minimal foraminal encroachment. He diagnosed plaintiff with sacroiliac joint dysfunction and ordered physical therapy.
5. Plaintiff continued working for defendant-employer and received no further known medical treatment for his back condition until September 11, 2003, when he saw Dr. Kerry Ainsworth for low grade, persistent symptoms. Dr. Ainsworth recommended that plaintiff see an orthopedic surgeon, and he was subsequently evaluated by Dr. Peter Birkedal.
6. Dr. Birkedal noted that plaintiff complained of worse, but still mild, back pain. Dr. Birkedal was of the impression that plaintiff had sacroiliac joint dysfunction and he ordered *Page 5 
sacroiliac joint injections. Despite the injections and more physical therapy, plaintiff complained of worsening symptoms by December 2003. In January 2004, Dr. Birkedal ordered another MRI. On February 10, 2004, Dr. Birkedal reviewed the MRI and noted a broad-based disc bulge at L4-5, with only mild foraminal narrowing, and a broad-based disc bulge at L5-S1, with some facet hypertrophy. In his opinion, plaintiff did not have a surgical lesion. Dr. Birkedal released plaintiff from his care and referred plaintiff to Dr. Nancy Faller, an anesthesiologist and pain management specialist, for further treatment.
7. On April 5, 2004, Dr. Faller evaluated plaintiff, who complained of persistent back pain that sometimes radiated to the right thigh. Plaintiff informed Dr. Faller that he continued working until one week prior, when his family doctor took him out of work. Plaintiff's neurological examination was normal and Dr. Faller felt plaintiff's symptoms were generated from the right lower facet joints. Dr. Faller recommended facet injections, both for diagnostic as well as therapeutic purposes. She also took plaintiff out of work. Plaintiff subsequently underwent the facet injection, which did not provide enough relief for Dr. Faller to recommend a follow-up radio frequency procedure. Dr. Faller ordered epidural steroid injections, which also did not provide significant relief. Ultimately, Dr. Faller diagnosed plaintiff with a bulging disc and radiculopathy but was unable to determine the source of plaintiff's pain. At her deposition, Dr. Faller testified that by July 24, 2004, she had exhausted her treatment options and that she released plaintiff from her care to return to the orthopedic surgeon. However, she did not give plaintiff work restrictions or assign a rating. Since he last saw Dr. Faller, plaintiff has not attempted to return to work in any capacity.
8. Defendants hired a nurse case manager who arranged for an independent medical evaluation by Dr. Mark Yates, an orthopedic surgeon, on September 1, 2004. Dr. Yates *Page 6 
performed a comprehensive examination of plaintiff and reviewed the two MRIs. Dr. Yates found no neurological deficit on examination. He recommended that plaintiff undergo a discogram with CT scan to determine whether he might be a surgical candidate. Although the CT scan showed the L3-4 disc was normal, plaintiff complained of increased pain with injection to that disc. The scan also showed annular tears at L4-5 and L5-S1, and injections at those levels produced similar results as the injection at L3-4. Only the tear at L5-S1 allowed leakage of the contrast material. The findings indicated that plaintiff was not a surgical candidate.
9. Dr. Yates then ordered a functional capacity evaluation, which was performed on October 22, 2004. Plaintiff was noted to self-limit on two-thirds of the tasks performed. With such high self-limiting behavior, the physical therapist could not determine plaintiff's actual work capacity, but found that he was capable of performing sedentary to light work on a full-time basis. The physical therapist felt plaintiff might require work hardening to build up strength so that he could work an eight-hour day.
10. Plaintiff returned to Dr. Yates on November 9, 2004. Dr. Yates felt plaintiff had reached maximum medical improvement, that he had sustained a five percent permanent partial impairment to his back and that he should be referred to vocational rehabilitation. Considering the self-limiting behavior during the functional capacity evaluation, Dr. Yates did not give plaintiff any work restrictions but indicated that plaintiff could do light work.
11. After he was released, plaintiff received medical treatment for back problems at the emergency room and from his family doctor, Dr. Richard Lord. Plaintiff subsequently reported problems with his legs giving way, dysuria and incontinence; however, the cause of these problems was not shown by the evidence. Dr. Lord referred plaintiff to Dr. Richard Jackson for a neurological evaluation. On July 12, 2005, plaintiff saw Dr. Jackson for an *Page 7 
examination, which was unremarkable except for some non-physiologic sensory disturbance. A subsequent EEG and brain MRI were normal. Dr. Jackson found no evidence of a primary neurological problem and recommended a psychiatric referral to deal with chronic pain.
12. On January 27, 2006, plaintiff underwent a second opinion evaluation by Dr. Vincent Paul, an orthopedic surgeon. Plaintiff used a cane to walk and complained of severe back pain that was worse with sitting, standing or exercising. Not having pertinent records from Dr. Faller, Dr. Paul concluded that plaintiff had primarily facet-related pain and recommended a medial branch block and radio frequency ablation. He was unaware that Dr. Faller had evaluated plaintiff regarding this possible diagnosis two years previously and had concluded that the radio frequency procedure would not be beneficial. Dr. Paul gave plaintiff restrictions for sedentary work, with the ability to get up ten minutes out of every hour, no lifting over five pounds, and no bending, lifting, or twisting. Dr. Paul rated plaintiff with a ten percent permanent partial impairment of the back. Dr. Paul testified that plaintiff probably would be unable to return to work because of other medical issues not related to his injury at work, but stated, "I do not believe he is fully disabled from a sit-down position."
13. Plaintiff alleges that he developed depression as a result of the injury at work and that he had not been treated for depression for approximately ten years prior to the injury. However, plaintiff regularly saw Dr. Wayne Denton, a psychiatrist, and John Mullen, a licensed clinical social worker, since June 1998. Plaintiff treated with Dr. Denton and Mr. Mullen for depression, anxiety and irritability, possible post-traumatic stress disorder associated with his Vietnam War experience, and possible bipolar disorder. Plaintiff last saw Mr. Mullen on August 1, 2002, less than a week before the injury at work. *Page 8 
14. Dr. Denton and Mr. Mullen's notes disclosed that plaintiff had prior episodes of problems at work with defendant-employer, which involved some conflict with his boss, a performance evaluation that criticized him for having "an attitude," and some difficulty dealing with issues at work. Plaintiff seriously contemplated changing jobs, and looked for other work. However, plaintiff had serious personal and family problems that outweighed the work-related issues and that subjected him to significant psycho-social stress. During treatment, plaintiff demonstrated a pattern of trying to avoid confrontation of his problems. There is insufficient evidence of record to show by the greater weight that plaintiff's psychological condition is causally related to his injury at work.
15. On May 11, 2005, plaintiff met with George Page, vocational rehabilitation counselor. Mr. Page administered the Wide Range Achievement Test to plaintiff, which showed that plaintiff read at the high school level. Mr. Page did not give him the math portion because he felt plaintiff was not focused enough to complete it. Based upon the functional capacity evaluation and Dr. Yates' records, Mr. Page testified that work was available for plaintiff in the Winston-Salem job market within the recommendations of the functional capacity evaluation of up to four hours of work per day for re-introduction into the workforce and that plaintiff would have been able to obtain employment if he made a diligent effort. Considering at Dr. Paul's restrictions from January 27, 2006, Mr. Page believed that plaintiff could do some sedentary work, although it might take some time for him to find a job.
16. When he met with plaintiff a second time on June 15, 2005, Mr. Page found that plaintiff was confused and seemed lethargic. Plaintiff's wife informed Mr. Page that plaintiff was having mini-strokes and was being treated by Dr. Lord. Mr. Page requested additional medical information from Dr. Lord, who was not an authorized treating physician for workers' *Page 9 
compensation purposes. When no further information was provided, Mr. Page closed his file. Mr. Page did not move forward with vocational rehabilitation efforts or ever look for work for plaintiff and did not think that plaintiff was ready for employment or vocational rehabilitation activities at that time. Nothing in plaintiff's medical records linked his lethargy and other symptoms with his injury at work. Mr. Page testified that plaintiff was not capable of employment because of his lethargy, confusion and slow speech skills. However, Mr. Page believed that from a strictly orthopedic and neurological standpoint, employment would have been available to plaintiff.
17. Defendants accepted plaintiff's claim as compensable in a Form 60 filed on February 3, 2005 and paid plaintiff temporary total disability at a rate of $323.32 per week retroactive to April 6, 2004. A Form 21 agreement was not submitted in this case.
18. As the result of his compensable injury by accident, plaintiff was disabled from any employment from April 6, 2004 until February 3, 2005. After February 3, 2005, plaintiff was capable of some work but did not make a reasonable effort to find employment due to other non-work related health issues.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 6, 2002, plaintiff sustained an injury by accident to his back arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Defendants admitted the compensability of plaintiff's injury by accident on August 6, 2002 by filing a Form 60 on February 3, 2005. During the period from April 6, 2004 *Page 10 
until the Form 60 was filed, defendants admitted the compensability of plaintiff's claim by paying compensation benefits to plaintiff. However, after the Form 60 was filed, plaintiff had the burden of proving continuing disability. Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277 (2001).
3. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
4. In the present case, plaintiff reached maximum medical improvement on November 9, 2004, was released to sedentary to light duty work and was referred to vocational rehabilitation. Dr. Jackson found that plaintiff had no neurological problems and both Drs. *Page 11 
Yates and Paul felt that plaintiff was capable of some work. Any continuing disability is due to conditions unrelated to plaintiff's injury by accident. Plaintiff's functional capacity evaluation showed that he was capable of some work; however, plaintiff has not looked for work since he was released from care by Dr. Faller on July 24, 2004. Defendants filed a Form 60 on February 3, 2005, paying plaintiff temporary total disability benefits retroactive to April 6, 2004. As such, plaintiff did not meet his burden to prove that after February 3, 2005 he was unable to obtain employment after a reasonable effort or that it was futile for him to seek employment because of other factors. N.C. Gen. Stat. § 97-29; Russell v. Lowes Product Distribution,supra.
5. As a result of his injury by accident on August 6, 2002, plaintiff is entitled to temporary total disability compensation at a rate of $323.33 per week beginning April 6, 2004 and continuing until February 3, 2005. N.C. Gen. Stat. § 97-29.
6. As a result of his injury by accident on August 6, 2002, plaintiff sustained permanent injuries to his low back. As a result of his injuries, plaintiff is entitled to a permanent partial disability rating of ten percent to the back, subject to a credit for defendants for any temporary total disability paid plaintiff after February 3, 2005. N.C. Gen. Stat. §§ 97-31(23); 97-42.
7. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
8. Plaintiff's depression and psychological problems are not causally related to the injury by accident giving rise to this claim. Click v.Freight Carriers, 300 N.C. 164, 265 S.E.2d 389 (1980); Anderson v. MotorCo., 233 N.C. 372, 64 S.E.2d 265 (1951).
 *********** *Page 12 
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendants shall pay plaintiff temporary total disability compensation at a rate of $323.33 per week beginning April 6, 2004 and continuing until February 3, 2005.
2. Subject to a reasonable attorney's fee approved below, defendants shall pay plaintiff permanent partial disability compensation for the ten percent impairment to the low back at the rate of $323.33 for 30 weeks.
3. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
4. Defendants are entitled to a credit for any temporary total disability paid plaintiff after February 3, 2005. However, a reasonable attorney's fee of 25% of the compensation awarded plaintiff in paragraphs 1 and 2 of this Award is approved for plaintiff's counsel. Prior to a deduction for the credit allowed herein, the attorney's fee shall be paid directly to plaintiff's counsel for his services to plaintiff.
5. Defendants shall pay the costs.
This 18 day of July, 2007.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1